UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DEMOULAS SUPER MARKETS, INC., <br><br> Plaintiff <br><br> v. <br><br> FEDERAL INSURANCE COMPANY, <br><br> Defendant. | Case No.:   23-10689 |

## COMPLAINT AND JURY DEMAND

Plaintiff Demoulas Super Markets, Inc. brings this action to recover the damages it has incurred as a result of the unfair and deceptive acts and practices Defendant Federal Insurance Company has committed in the conduct of the insurance business in violation of Mass. Gen. Laws c.176D, §§ 3(9)(d), (f) and (g) and Mass. Gen. Laws c.93A, §§ 2 and 11 - and arising from Defendant's breach of its contractual obligations to Plaintiff.

## PARTIES

1.      Demoulas Super Markets, Inc. ("DSM") is a Massachusetts corporation with a place of business at 875 East Street, Tewksbury, Massachusetts 01876.

2.      Federal Insurance Company (referred to herein as "Chubb") is a stock insurance company incorporated under the laws of Indiana, with a principal place of business at 202B Hall's Mill Road, Whitehouse Station, New Jersey 08889.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). Plaintiff is a citizen of Massachusetts, Defendant is a citizen of Indiana and New Jersey, and the amount in controversy exceeds $75,000.

4.      This Court has personal jurisdiction over the Defendant pursuant to G.L. c. 223A, § 3(a)–(d), (f).

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(1), (2).

### FACTS

6.      DSM was an insured under Chubb Policy No. 8243-5367, which provides fiduciary liability coverage of $15 million, for the policy period from August 1, 2018 to August 1, 2019 (the "Chubb Policy") in exchange for premium payments made by DSM.  DSM made all its required premium payments and otherwise met its obligations under the Chubb Policy.

7.      DSM was also an insured under National Union Fire Insurance Company of Pittsburg, Pa. ("AIG") Excess Edge Insurance Policy Number 01-760-19-93, for the Policy Period from August 1, 2018 to August 1, 2019 (the "Excess Policy"), supplementing the Chubb Policy, with a liability limit of $10 million, triggered upon reaching the underlying Chubb Policy limit of $15 million either by payments by Chubb or payments "by, on behalf of or in place of the Underlying Insurers of amounts covered in the Underlying Policies."

8.      On or about July 30, 2019, a proposed class-action complaint on behalf of a class of employees participating in the DSM (Restated) Profit Sharing Plan and Trust (the "Plan") was filed in the United States District Court for the District of Massachusetts and captioned *Toomey v. Demoulas Super Markets, Inc. et al.*, bearing Case No. 1:19-cv-11633-LTS.  The proposed class-action lawsuit included counts for Breach of the Duty of Prudence pursuant to 29 U.S.C. §1104(a)(1)(B) and for Failure to Monitor Fiduciaries (the "ERISA Action").  The proposed class-action complaint sought the award of damages, interest, and attorneys' fees.

9.      Plaintiff promptly filed a claim with Chubb for insurance coverage under the Chubb Policy.

10.     DSM hired a prominent attorney at a leading national law firm ("DSM's Counsel") to represent its interests in the ERISA Action.  Chubb approved DSM's Counsel's retention.  In early August 2019, DSM's Counsel contacted the claims manager assigned by Chubb -- a "Senior Claim Director," North American Financial Lines Claims -- to discuss defense of the case and a potential motion to dismiss.  DSM's Counsel informed the Senior Claim Director that DSM's strategy would be to put substantial efforts and resources into a strong motion to dismiss based on First Circuit precedent concerning conservative retirement plans.  DSM's Counsel explained that the reason for this strategy was that the motion was the best chance to limit exposure.  At all times relevant to this case, DSM's Counsel had regular substantive communications with the Chubb Senior Claim Director as to factual, liability and damages issues.

11.     On or about September 27, 2019, DSM and the other class-action defendants filed a motion to dismiss the ERISA Action.  The class-action plaintiffs' opposition was filed on or about October 28, 2019, and the motion was fully briefed with the class-action defendants' reply on November 4, 2019.  During the pendency of the motion to dismiss, DSM's Counsel successfully postponed the production of any documents.  The Court heard argument on the motion to dismiss on April 8, 2020.  On April 16, 2020, the Court issued an order denying the motion to dismiss.  The class-action defendants filed their answer to the complaint on April 30, 2020.

12.     Thereafter, on multiple occasions between April 16, 2020 and September 3, 2020 by emails and memoranda, DSM's Counsel stressed to Chubb that settlement through mediation was very important because further discovery would prolong the litigation and lead to discovery of damaging information that would be "problematic and indisputably increases [DSM's] exposure."

13.     Chubb was also informed in advance of mediation that without early settlement the legal fees that would be spent in extensive discovery involving the Company, including discovery from hostile directors who were involved in a highly publicized internal corporate fight for control of DSM in 2014 and 2015, would severely erode the $15 million insurance coverage cap.

**The Mediation**

14.     After filing of the class-action defendants' answer, DSM's Counsel and the class-action plaintiffs' counsel agreed to conduct a mediation. While DSM's Counsel was successful in postponing production of most documents until after the mediation, class-action plaintiffs' counsel did require DSM to produce certain documents as a condition of going forward with mediation. For instance, class-action plaintiffs' counsel demanded that DSM produce Plan trustee minutes and meeting materials.  Class action plaintiffs were provided with those documents that were demanded in advance of the mediation, but other potentially relevant documents that could increase DSM's liability were not produced before the mediation.

15.     In a letter to DSM's Counsel dated May 22, 2020, class action plaintiffs asserted that they could prove $90 million in damages and made a settlement demand of $45 million. DSM's Counsel shared that letter with Chubb on June 11, 2020, and with AIG in conversations as confirmed in a September 29, 2020 e-mail to AIG.

16.     The parties agreed to participate in a mediation with an individual who is one of the most-highly-regarded ERISA-claim mediators in the country (the "Mediator"). Both Chubb and AIG were informed of the Mediator's selection in advance of the mediation.

17.     Both insurers had substantial experience with the Mediator in other cases.  Chubb accepted the Mediator and AIG did not object.  With good reason.  The Mediator is a Distinguished Fellow in The College of Labor and Employment Lawyers, as well as a Distinguished Fellow in

the American College of Civil Trial Mediators.  He has served as a neutral in scores of national

class, collective, and mass actions (including mediating Morgan Stanley, Smith Barney, FedEx,

Abercrombie, Viacom, Disney, NBC, Time Warner, Coca-Cola, Home Depot, Publix, Boeing,

Wal-Mart, Dell, Xerox, Lowe's, Cigna, Lockheed, Credit Suisse, Mutual of Omaha, General

Dynamics, Boeing, Bechtel, Intrawest, AXA, and Allscripts class and collective action cases).  The

Mediator focuses on ERISA claims (e.g., 401k breach-of-fiduciary-duty claims) as well as

securities fraud cases.

18.     At the time, neither Chubb nor AIG expressed any concern that it was too early in

the case for mediation, nor did either insurer ever suggest that mediation be postponed until a later

date.  In fact, the appropriateness of the timing of the mediation vis-à-vis the case was never

broached by Chubb until *after* Chubb discovered that it would be required to pay the full policy

limit.

19.     Prior to the mediation, DSM's Counsel, with Chubb's agreement, retained a well-

known, leading expert in ERISA cases (the "Expert") to analyze class-action plaintiffs' potential

provable damages.  The Expert is recognized as a leading expert witness on damages issues in

ERISA cases.  He has been retained as an expert for the class-action defendants in more than 50

ERISA cases and testified in several cases that went to trial.  Chubb is highly familiar with the

Expert's stellar reputation and approved his retention by DSM's Counsel for the purpose of

estimating the defendants' potential exposure.  The Expert's analysis, which was provided to both

Chubb and AIG in advance of the mediation, conservatively valued plaintiffs' claims at $32.5

million.  Importantly, the Expert was unaware of the additional, unproduced, and likely

discoverable documents and, therefore, his analysis did not take those documents into account.

Chubb did not dispute the Expert's estimate of potential exposure, nor did it inform DSM's

Counsel that it had performed any independent analysis of the plaintiffs' potential provable damages.

20.     Prior to the mediation, DSM's Counsel advised Chubb that this was "a policy limits exposure" case.  By that, DSM's Counsel meant that it would take at least the full value of the Chubb policy to settle the litigation.  DSM's Counsel repeatedly asked Chubb to disclose its settlement authority in advance of the mediation.  Chubb, inexplicably, refused to do so.  As a result, DSM was forced to conduct the mediation in the dark, without knowing whether Chubb would agree to pay *any* settlement amount, much less whether Chubb would honor its full obligations under the Chubb Policy.

21.     The mediation was held on September 30, 2020 via Zoom.  Two Chubb representatives were present, the Senior Claim Director, and her supervisor, who described himself as the boss of the Eastern Fiduciary Book of Business at Chubb.  AIG was informed of the mediation and provided with all materials, but it chose not to participate.  Chubb was provided with a draft of – and made revisions to – DSM's mediation statement prior to its submission to the Mediator.

22.     The mediation did not result in a settlement on September 30, 2020, as the parties were too far apart in their respective positions.  Nevertheless, thereafter the Mediator continued separate settlement discussions with the parties.

23.     On Friday, October 2, 2020, the Mediator informed DSM's Counsel of a settlement demand of $20 million from class-action plaintiffs, which demand would be held open only until Monday, October 5.

24.     DSM's Counsel reported the communication with the Mediator to Chubb immediately and sought to have a call with Chubb that afternoon.  Because Chubb was not

available until Monday morning, October 5, 2020, DSM's Counsel sought a call on Monday morning to discuss Chubb's settlement authority and stressed that the class-action plaintiffs' offer was being held open only until that Monday.  DSM's Counsel also provided, at Chubb's request, a written summary of DSM's Counsel's call with the Mediator.

25.    Chubb did not provide DSM's Counsel with settlement authority either at the call on October 5, 2020 or in the days following, despite urging from DSM's Counsel and the Mediator that it do so.

26.     Two days later, on Wednesday, October 7, 2020, the Mediator emailed DSM's Counsel at approximately 6:41 a.m. to get an update.  As Chubb had not yet provided an answer, DSM's Counsel informed the Mediator that she was unable to provide him an answer but was aware that it was important that she obtain an answer as soon as possible.  DSM's Counsel also reported that the Court had, *sua sponte*, moved the conference that had been scheduled for that day – October 7, 2020 – to the following week.

27.    DSM's Counsel received no answer from Chubb on October 7, and after close of business that day, DSM's Counsel reported to the Mediator that no answer had yet been received.

28.    When, as of Wednesday, October 8, 2020, DSM's Counsel still did not have any settlement authority from Chubb, DSM's Counsel requested a call to "understand Chubb's authority" and informed Chubb that the Mediator was "stressing that we are now more than a week out from the mediation."

29.    During that October 8, 2020 call, DSM's Counsel informed both Chubb and AIG that the Mediator would be putting forth a Mediator's Proposal of $17.5 million.

30.    Following the October 8 call, DSM's Counsel sent Chubb an email that same day memorializing the call, and reiterating to Chubb that, as a result of conversations DSM's Counsel

had with the Mediator, DSM's Counsel was left with the understanding that any attempt to force the negotiations below the $17.5 million Mediator's Proposal would risk the plaintiffs walking away.

31.     DSM's Counsel also confirmed via the October 8 email that DSM's Counsel had informed Chubb that DSM had "decided that it is in the best interests of Chubb's insureds, Demoulas Super Markets and the Trustees of the Demoulas Profit Sharing Plan, to settle the ERISA litigation at this time" and that DSM's counsel was "directed to settle the litigation at the amount of the Mediator's Proposal," i.e., $17.5 million, and informed Chubb that "the Mediator's Proposal will be made tomorrow morning," i.e., the morning of October 9.

32.     In response both to DSM's Counsel's report on the October 8 call and to DSM's Counsel's October 8 email, Chubb refused to honor its full obligation under the Chubb Policy, offering only $10 million instead, notwithstanding that (1) $17.5 million was the *independent* mediator's assessment of a fair and reasonable settlement, (2) Chubb knew that the Mediator was not aware of the existence of certain problematic documents that could *increase* DSM's liability, and (3) $17.5 million was nearly 50% lower than DSM's own expert's assessment of *conservative* potential damages.

33.     Given Chubb's position, AIG initially refused to contribute to the settlement of $17.5 million, causing further harm to DSM.  Chubb has articulated no reasonable basis for dismissing or discounting the Mediator's Proposal.

34.     Even though Chubb refused to honor its contractual obligation to pay the coverage amount, DSM accepted the Mediator's Proposal because, among other reasons, (1) DSM's liability was reasonably clear, (2) DSM's damages exposure was substantially higher than $17.5 million,

and (3) proceeding with litigation would come with added costs, and therefore settlement on such terms was the only reasonable approach.

35.     On October 12, 2020, DSM's Counsel informed Chubb that the Class Action Plaintiffs had accepted the $17.5 million settlement.  A settlement agreement was reached thereafter (the "Settlement Agreement").

36.     On November 20, 2020, the parties in the ERISA Action moved for preliminary approval of the class-action Settlement Agreement.  The Court preliminarily approved the Settlement Agreement on November 24, 2020 and finally ordered its approval on April 7, 2021.

37.     After the Settlement Agreement was reported to the Court, DSM continued to communicate with Chubb regarding Chubb's refusal to make a reasonable tender of settlement and its failure to pay $15 million towards the agreed $17.5 million of the settlement of the ERISA Action.

38.     In defense of its unjustifiable refusal to honor its obligations under the Chubb Policy, Chubb has repeatedly and falsely asserted that DSM's Counsel's assessment of the fair settlement value of the case was based on 1% of the plan assets, or approximately $8.5 million. DSM's Counsel never made any such assessment, orally or in writing.  To the contrary, DSM's Counsel suggested that 1% of total plan assets *might* constitute a reasonable *starting* position for negotiations.

39.     In further attempting to gain leverage against its insured to accept an unreasonable contribution to settlement, counsel for Chubb, in a December 1, 2020 letter, threatened to refuse to pay *any* amounts if DSM continued to insist that it receive what it was entitled to under the Chubb Policy.  That letter concluded with the clear threat that Chubb "reserve[s] all rights as to its ongoing investigation, including the right to deny coverage for the [ERISA action] if warranted by

the circumstances." The purported basis for such denial was the existence of certain facts of which Chubb was well aware *prior* to the mediation and *prior* to committing to pay $10 million (plus approximately $700,000 in incurred defense costs) toward the settlement amount, a commitment on which Chubb knew that DSM relied.

40.     After counsel for DSM pointed out that Chubb's threats were baseless, and that Chubb's liability was clear, on January 12, 2021, Chubb's counsel increased Chubb's offer by $150,000 – 1% of the policy amount – to contribute a total amount of $10.85 million to the Settlement Agreement.

41.     On February 10, 2021, Chubb indicated that it would contribute an "initial $7.5 M" towards settlement of the ERISA Action.

42.     Then in an email dated May 17, 2021, Chubb's counsel inexplicably appeared to renounce its prior offer of $10.85 million stating that, "Chubb agrees to contribute $7.5M towards the settlement. Chubb believes this amount represents the reasonable settlement value of the underlying case." Chubb's counsel made clear that its prior offer to contribute $10.85 million (inclusive of costs) was off the table, writing "Chubb will not respond to your client's most recent proposal for a compromise of the dispute over the reasonableness of the $17.5M settlement." In a later email, Chubb's counsel wrote to correct a "typo" and stated, "the amount is $7.8 M not $7.5M."

43.     On June 10, 2021, Chubb made a payment of the $7.8 million. DSM acknowledged receipt of a check from Chubb in the amount of $7.8 million and expressly reserved all of its rights to recover the total amount of $15 million (plus multiple damages and costs), which is due and owing in payment of the claims of DSM under the Chubb Policy and applicable law.

44.     Chubb continued its shifting positions in an attempt to lowball a settlement with DSM after payment of the amount of $7.8 million.  In a letter dated June 21, 2021, Chubb's counsel stated: "...[Chubb] reiterates its prior offer to contribute a total of $10.15 million to the settlement in exchange for a full release of all claims. After accounting for the $7.8 million already paid, this would involve an additional settlement payment of $2.35 million. *That offer is still on the table*." (Emphasis added.)  But that statement was merely an attempt to rewrite history as there was no such offer on the table at the time.  Chubb's previous offer of $10.85 million had been withdrawn by Chubb's counsel on May 17, 2021.[1]

45.     On July 2, 2021, DSM paid $17.5 million to class action plaintiffs as the full amount due under the Settlement Agreement.

46.     After substantial back and forth, on July 9, 2021, AIG paid the amount of $2 million towards the Settlement Agreement in response to the claim of DSM under AIG's Excess Policy, an amount that constituted 80% of what DSM was entitled to under the Excess Policy.

### COUNT I
### Violations of Mass. Gen. Laws c. 176D § 3(9)(d)

47.     Plaintiff DSM incorporates by reference as though fully restated herein its allegations in paragraphs 1 through 46 above.

48.     Defendant Chubb refused to pay DSM's claim before conducting a reasonable investigation based upon all available information in violation of Chapter 176D§ 3(9)(d).

49.     Chubb had and continues to have no reasonable basis for disregarding the Mediator's Proposal nor for disregarding the Expert's analysis.  Chubb was aware of facts that could potentially increase DSM's liability and exposure.  Chubb did not dispute that a reasonable

---

[1] The $10.85 million offer that had been withdrawn was inclusive of costs.  The $10.15 million figure referenced in the June 21, 2021 letter appears to be exclusive of costs.

person, with knowledge of the facts and law, would probably have concluded, for good reason, that Chubb was liable to DSM for the full policy amount of $15.0 million.

50.     Chubb violated and continues to violate Chapter 176D § 3(9)(d) by refusing to pay DSM's claim without conducting a reasonable investigation based upon all available information and thereby committed unfair or deceptive acts or practices in the business of insurance.

**COUNT II**
**Violations of Mass. Gen. Laws c. 176D § 3(9)(f)**

51.     Plaintiff incorporates by reference as though fully restated herein its allegations in paragraphs 1 through 50 above.

52.     Chubb failed and refused to effectuate a prompt, fair and equitable settlement of DSM's claim after liability was reasonably clear, in violation of Chapter 176D § 3(9)(f).

53.     Chubb knew that it was reasonably clear that DSM faced liability based upon its extensive discussions with DSM's Counsel from the beginning of the ERISA Action, the opinion of DSM's Counsel, the Order of the Court in its denial of the motion to dismiss, and the analysis of the renowned expert mediator.

54.     In addition, Chubb knew that DSM's likely exposure was well over the settlement amount, as Chubb knew that the Expert evaluated DSM's exposure at $32.5 million.   Moreover, Chubb knew that the Expert's analysis did not take into account additional documents that could potentially increase DSM's exposure.

55.     Chubb also knew that failure to settle would likely result in substantial defense costs that would erode the Chubb Policy amounts.

56.     Rather than abide by its contractual and statutory obligations, Chubb instead attempted to leverage an unfair settlement with its insured, making a series of inequitable and at times conflicting settlement offers and even reducing the low settlement offer initially made.

Moreover, Chubb threatened to refuse to pay *any* amounts if DSM continued to insist that it receive what it was entitled to under the Chubb Policy.

57.     Chubb failed to effectuate a prompt, fair and equitable settlement with DSM after liability was reasonably clear in violation of Chapter 176D § 3(9)(f) and thereby committed unfair or deceptive acts or practices in the business of insurance.

**COUNT III**
**Violations of Mass. Gen. Laws c. 176D § 3(9)(g)**

58.     Plaintiff incorporates by reference as though fully restated herein its allegations in paragraphs 1 through 57 above.

59.     Chubb knew that liability was reasonably clear, knew that DSM's exposure was likely substantially over the settlement amount, and knew that defense costs were likely to be substantial if the case did not settle.  Nevertheless, Chubb engaged in intentional "lowballing" of DSM by extending settlement offers that were substantially less than the clear liability due under the Settlement Agreement as set forth herein.  Chubb even reduced its initial lowball settlement offer.  Chubb also exacerbated its lowballing by baselessly threatening to deny coverage altogether if DSM did not accept Chubb's unreasonable offers.

60.     Chubb violated Chapter 176D § 3(9)(g) by intentionally lowballing DSM in making settlement offers and baselessly threatening to deny coverage altogether and thereby committed unfair or deceptive acts or practices in the business of insurance.

**COUNT IV**
**Violations of Mass. Gen. Laws c. 93A §§ 2 and 11**

61.     Plaintiff incorporates by reference as though fully restated herein its allegations in paragraphs 1 through 60 above.

62.     DSM and Chubb are engaged in the conduct of trade or commerce in Massachusetts.

63.     Chubb's lowballing, threat to deny coverage, and refusal to effectuate a prompt, fair and equitable settlement constitute knowing and willful unfair and deceptive acts or practices.

64.     DSM has suffered the loss of money or property as the result of Chubb's unfair or deceptive acts or practices.

**COUNT V**
**Breach of Contract**

65.     Plaintiff incorporates by reference as though fully restated herein its allegations in paragraphs 1 through 64 above.

66.     DSM and Chubb are parties to a contract – the Chubb Policy.

67.     Pursuant to the Chubb Policy, and in consideration of premium payments made by DSM to Chubb, Chubb was required to pay settlement amounts and defense costs incurred by DSM, up to the policy limit.

68.     Chubb has refused to pay the settlement amounts and defense costs incurred by DSM up to the policy limit.

69.     Chubb has therefore breached its contract with DSM and DSM has been damaged thereby.

**JURY DEMAND**

PLAINTIFF DEMOULAS SUPER MARKETS, INC. HEREBY REQUESTS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

**RELIEF REQUESTED**

Wherefore, Plaintiff Demoulas Super Markets, Inc. hereby respectfully requests the entry of a judgment:

a.)  Finding Defendant Federal Insurance Company liable on each and every Count of the Plaintiff's Complaint;

b.) Awarding Plaintiff its actual damages, trebled, plus its costs and reasonable attorneys' fees pursuant to the provisions of G.L. c. 93A, plus prejudgment interest; and,

c.). Awarding Plaintiff such further relief as the Court deems just and appropriate.

DEMOULAS SUPER MARKETS, INC.
By its attorneys,

Jonathan W. Fitch, BBO # 168510
Peter E. Ball, BBO # 546031
Michele E. Connolly, BBO # 680946
Malgorzata A. Mrózek, BBO # 699035
FITCH LAW PARTNERS LLP
84 State Street
Boston, MA 02109
(617) 542-5542
jwf@fitchlp.com
peb@fitchlp.com
mec@fitchlp.com
mam@fitchlp.com

Dated: March 30, 2023